UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                        CASE NO.

**NEW ORLEANS AUCTION GALLERIES, INC.**          **11-11068**
                                                      SECTION A
DEBTOR                                                   CHAPTER 11

**REASONS FOR DECISION**

On November 15, 2012, the Court held an evidentiary hearing on the following motions: (1) Motion for Leave to File Proof of Claim filed by Kurt Wille,[1] (2) Objection to Claim of Kurt Wille filed by David Adler, Trustee of NOAG Litigation Trust ("Trustee"),[2] and (3) Motion for Return of Property and/or to Enforce Order filed by Kurt Wille.[3] After the hearing the Court took the matter under advisement.

**I. Findings of Fact**

Kurt Wille ("Seller") entered into an agreement with the debtor, New Orleans Auction Galleries, Inc. ("NOA"), in late 2010 ("Consignment Contract")[4] for the sale of several consigned items in the January 2011 auction, including a Chinese Seal.

The Consignment Contract provided that NOA was entitled to deduct from the sales price ("hammer price") a seller's premium or percentage fee based on the amount realized for each lot sold and calculated as 25% on the first $500.00, 20% of amounts from $501.00-$1,500.00; 15% on

---

[1] Pleading 536.

[2] Pleading 503.

[3] Pleading 548.

[4] NOA could not produce the original contract signed by Seller and instead introduced another consignment contract which its former employee, Richerson Rhodes, testified is identical to the Consignment Contract signed by Seller. Trial Exhibit 1.

amounts from $1,501.00-$2,500.00; and 10% of all amounts over $2,500.00.[5] Seller also agreed to pay "$25.00 per color website illustration, $40.00 per black-and-white catalogue illustration, $75 per color catalogue illustration and $250.00 per color brochure illustration."[6]

In addition, Seller was responsible for an insurance premium of "1.5% of the mean estimate" and "all packaging and transportation costs.[7]

The Consignment Contract also provided that if a buyer failed to pay:

> [NOA] shall have the option, at its sole discretion, to (a) enforce payment by civil action or other proceedings against the [buyer]; (b) void the sale as if said sale had not occurred; or (c) exercise any other remedy or remedies available under the law, ... The Seller hereby designates [NOA] as the Seller's agent, and attorney-in-fact to enforce all remedies against any Purchaser, ....[8]

Seller was allowed to set a minimum bid or reserve price on any items with values of at least $500.00.[9]

NOA publishes a catalog prior to each of its auctions. The catalog is illustrated and provides a general description of the item offered for sale, as well as, an anticipated sale price range. NOA estimated that the Chinese Seal would sell in the range of $800- $1,200.[10] NOA's Consignor Statement shows that the reserve on the Chinese Seal was $750.00.[11]

---

[5] Trial Exhibit 1, ¶ 2.

[6] *Id*. at ¶ 5. At trial, NOA did not request payment for any costs associated with this sale.

[7] *Id*. at ¶ 6 and 7.

[8] *Id*. at ¶ 11.

[9] *Id*. at ¶ 3.

[10] Trial Exhibit 2.

[11] Trial Exhibit 6.

Danny Pun ("Pun") purchased the Chinese Seal at auction for a hammer price of $65,000. In addition to the hammer price, all purchasers are charged a buyer's premium equal to 23%, or in this case, $14,950. Thus, the total purchase price for the Chinese Seal was $79,950. On February 23, 2011, Pun made the $79,950 payment to NOA with two (2) credit cards,[12] charging $30,000 on an American Express card and $49,950 on a Mastercard. He then took possession of the Chinese Seal.

After Pun paid NOA and received the Chinese Seal, he began to question its authenticity and disputed the charges made on his credit cards. Both Mastercard and American Express withheld the funds from NOA pending resolution of the dispute.

Under the terms of the Consignment Contract, if a dispute arises over the sale of an item, NOA may, but is not obligated to, pursue the purchaser for payment. All costs of collection are borne by the seller. In addition, Seller agrees to hold NOA harmless from any claims based on representations made concerning the item. In this case, Pun claimed that the Chinese Seal was composed of man made material rather than as described in the catalog. As a result, Pun disputed his obligation to complete the purchase. NOA countered by asserting the terms of sale, which include a waiver by each purchaser of all warranties or representations as to the quality and condition of the objects offered.

The dispute between NOA and Pun remained unresolved when NOA filed its petition under Chapter 11 of the Bankruptcy Code on April 1, 2011.[13] During the initial days following the filing,

---

[12] Trial Exhibit 3.

[13] NOA originally scheduled Pun as holding an unsecured nonpriority claim in the amount of $78,330.00. Pleading 74. NOA later amended its schedules to show the amount due to Pun as $0 and that his claim was contingent, unliquidated and disputed. Pleading 239.

NOA admitted that the proceeds of the January auction had been used to fund operational expenses. As a result, many of the consignors had not been paid for items sold at sale. Seller was one of these consignors.[14] NOA scheduled Seller as an unsecured nonpriority creditor for $59,624.00, representing the net amounts due to Seller based on sales of undisputed consigned items for which payment had been received.

On April 7, 2011, NOA filed a Motion to Assume certain pre-petition consignment contracts and make cure payments.[15] The consignment contract with Seller was among those assumed. According to NOA, Seller consigned several items on November 22, 2010 which were sold at the January 2011 auction. As of the date of the Motion, NOA represented that it owed Seller $59,624.50 in net sales proceeds after deducting costs of sale and commissions.[16] NOA's calculations did not include the sale proceeds attributable to the Chinese Seal as NOA represented that they had not been collected.

The deadline for filing proofs of claim was September 7, 2011 ("Bar Date").[17] Notice of the Bar Date was served on Seller.[18] Seller did not file a proof of claim. At the time of the Bar Date, NOA had not received payment on the Chinese Seal.

At all times prior to the November 15, 2012, hearing, NOA's consignment agent, Richerson Rhodes, represented to Seller that the credit card companies were withholding payment pending

---

[14] Pleading 74, Schedule F.

[15] Pleading 33.

[16] Pleading 33, Exhibit A.

[17] Pleading 126.

[18] Pleading 127.

4

resolution of Pun's dispute. He assured Seller that when NOA received payment, NOA would pay Seller pursuant to the assumed contract.

In addition, at all times prior to the November 15, 2012, hearing, NOA's counsel represented to the Court that no credit card funds for the Chinese Seal had been released to it.

Mastercard eventually reversed the charges made by Pun for the Chinese Seal, crediting. Pun $49,950.00. On the other hand, American Express ultimately favored NOA in the dispute and credited NOA $30,000.00.[19] The funds were deposited by American Express into NOA's consignment escrow account on October 26, 2011.

NOA's Disclosure Statement was approved on April 26, 2012. Seller was served with the Order approving the Disclosure Statement and scheduling the confirmation hearing.[20] Seller was also served with a copy of the Disclosure Statement, Ballot, and Sixth Amended Plan of Reorganization.[21] NOA's Sixth Amended Plan with Immaterial Modifications[22] ("Plan") was confirmed on June 1, 2012.[23] Notice of Confirmation was served on Seller.[24]

As part of its Plan, NOA sold substantially all of its assets. Priority, administrative and secured claims were paid following the sale. NOA established the NOAG Litigation Trust ("Trust")

---

[19] Trial Exhibit 5.

[20] Pleading 427.

[21] Pleading 429.

[22] Pleadings 423, 446, 454.

[23] Pleading 456.

[24] Pleading 457.

for the purpose of liquidating any remaining assets and distributing the residual sale proceeds to unsecured claimants.[25]

Seller has never received any payments by NOA for the Chinese Seal.

## II. Law and Analysis

### A. Proof of Claim

Under the terms of this Court's Order, all creditors holding prepetition claims against NOA were required to file proofs of claim by September 7, 2011, if they disputed the amounts NOA scheduled as due ("Bar Date"). Although Seller was owed at least $59,0624.50 prepetition based on the sale of several consigned items by NOA, after NOA assumed Seller's contract, payment for these items was forwarded. Thus, as of the Bar Date, Seller had no claim against NOA as NOA had not received any funds for the Chinese Seal.

Seller's failure to file a proof of claim by the Bar Date is of no consequence as his claim did not arise until payment was received by NOA, post-petition, and after the Bar Date. Instead, Seller's rights are incident to NOA's assumption of the Consignment Contract.

### B. Assumption of Executory Contract

When a debtor assumes an executory contract, the debtor must cure any default and "provide adequate assurance of future performance under such contract."[26]

---

[25] Pleading 423, Plan, section 7.2(b).

[26] 11 U.S.C. § 365(b).

NOA assumed the Consignment Contract with Seller and was authorized by the Court to pay its cure amount of $59,624.50.[27] NOA's assumption of the Consignment Contract also obligated it to continue to perform under its terms. The Consignment Contract provides:

> Upon receipt by the Company of the full purchase price of any item from the Purchaser, the Company shall forward, within thirty business days after receipt of said purchase price, an amount equal to the purchase price less all applicable commissions, expenses, insurance premiums, storage charges and other amounts due to or paid by the Company as specified herein.

As a debtor-in-possession, NOA was also obligated to operate its business in compliance with Louisiana law which provides:

> Every auctioneer shall pay the consignor within thirty days from the receipt of funds, or within sixty days from the date of sale at auction, whichever is lessor, or alternatively return to the consignor by that time, all property purchased but not yet paid for ... and render a full account of all sales and all property entrusted to him for sale by anyone employing his services whenever the owner of such money or property demands an accounting.[28]

In addition, Louisiana law requires that:

> All funds derived from an auction sale paid to an auctioneer licensed in this state or to a person, corporation, ....which conducted the sale, shall be deposited in one or more identifiable bank accounts maintained in the state ....and no funds belonging to the auctioneer shall be deposited therein except....funds reasonably sufficient to pay bank charges, funds due in part to the person employing the auctioneer and in part to the auctioneer (but said funds shall be withdrawn after deposit)....

The evidence established that both American Express and Mastercard initially credited NOA's account with funds representing the sales price plus buyer's premium following the January auction. However, because of the dispute initiated by Pun, both companies reversed the credits prepetition, pending investigation. At trial, NOA did not dispute the credit card companies' right

---

[27] Pleading 67.

[28] La. R.S. 37:3125.

to take this action. In fact, throughout the administration of the case, both NOA and its counsel maintained that no payments had been received from Pun for the Chinese Seal.[29] Nevertheless, on October 26, 2011, American Express credited NOA with a payment of $30,000.00 by electronic transfer directly to its consignment account.[30] On receipt of these funds, NOA failed to notify Seller. The Court finds that pursuant to both the Consignment Contract and Louisiana law, Seller is entitled to payment of his property.

The Plan provides that cure payments required as a result of the assumption of executory contracts were to be made either on the Effective Date (as defined by the Plan) or as otherwise agreed to by the parties. However, if a dispute existed regarding a cure amount or "any other matter pertaining to assumption," payment was to "be made following the entry of a Final Order resolving the dispute."[31] The Effective Date was July 6, 2012.[32]

The amounts due to Seller are not payments in cure on assumption. As previously explained, Seller's contract was assumed on May 9, 2011, and a cure payment was made in the amount of $59,624.50 or the amounts due in cure. The amounts owed Seller are for sums collected after

---

[29] After NOA filed for relief, Pun filed a proof of claim for return of the proceeds paid for the Chinese Seal. NOA steadfastly maintained that Pun was not a creditor of NOA because he had not paid for the item due to the reversed charges on account. Following confirmation, Pun's proof of claim was subject to Objection. As late as April 10, 2012, NOA asserted in pleadings against Pun that it had not received *any* amounts on the Chinese Seal. *See*, Pleading 333, ¶ 15.

[30] Trial Exhibit 5. It appears this was the normal course of dealing between NOA and its vendor credit card companies. *See* NOA's Monthly Operating Reports, Pleadings 103, 115, 137, 164, 200, 223, 268.

[31] Pleading 423, section 9.4.

[32] Pleading 477.

assumption and cure. Therefore, they represent the proceeds of NOA's postpetition performance under the consignment contract and constitute Seller's property.

Actually, all monies held in the consignment escrow account were the property of third parties. NOA may have had a claim against those funds for costs and commissions, but they were not property of the estate. It appears that following confirmation, NOA turned over the residual funds in the escrow account to the Trust without reconciling the account to ensure that all third parties had received the property due to them. NOA's actions converted Seller's property.[33] Since the conversion did not take place until after confirmation and the Effective Date, Sellers' claims cannot be administrative. While a claim in conversion exists against NOA post-confirmation, the same claim exists against the Trust for receiving property owned by a third party.[34]

If a party attempts to transfer property which he does not own, title does not transfer.[35] In this case, the Trust was fully aware that the proceeds of the consignment escrow account were deposits made from sales of consigned property. As such, it was aware that those deposits belonged to third

---

[33] "A conversion consists of an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion." *Quealy v. Paine, Webber, Jackson & Curtis, Inc.*, 475 So.2d 756, 760 (La. 1985). "Issues of fault, intent, negligence, knowledge or ignorance, and/or good faith are not involved in actions for tortious conversion." *Labbe v. Premier Bank*, 618 So.2d 45, 46 (La.App. 3 Cir. 1993) (citation omitted).

[34] Under Louisiana law a good faith transferee of converted property is liable for the return of the property, but not for damages. *Haddad v. Tolbert*, 426 So.2d 328, 330 (La.App. 2 Cir. 1983). However, the Trust was not in good faith because, as discussed *infra*, the Trust was aware that it was receiving proceeds of the consignment escrow account.

[35] La. C.C. art. 2452.

parties and should not have been transferred to it.[36] The Plan provides that *all property of NOA* after the payment of administrative, priority and secured claims is to be transferred to the Trust after the Effective Date.[37] Since the funds in the consignment escrow account were not property of NOA, the Trust had no right to receive funds from that account. Therefore, it must account for those proceeds and return them to their rightful owners, otherwise it will be unjustly enriched at the expense of Seller and perhaps others.

"A person who has been enriched without cause at the expense of another person is bound to compensate that person."[38] The five (5) elements of unjust enrichment under Louisiana law are:

> (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) an absence of justification for the enrichment and impoverishment; and (5) no other available remedy at law.[39]

When NOA transferred funds *belonging* to Seller to the Trust, the Trust was enriched and Seller was impoverished. Therefore, the first three (3) elements have been satisfied.

The fourth element is "an absence of justification for the enrichment or impoverishment." "An enrichment has legal justification when it flows from the proper application of a rule of law or

---

[36] To the extent costs or commissions were due to NOA by any party with funds on deposit in the consignment account, both Louisiana auction law and the consignment agreements allowed NOA to deduct from the amounts due a consignor the costs or commissions due to NOA. However, nothing permitted NOA to convert the residual amounts or to transfer them to one other than the consignor.

[37] Pleading 423, section 2, pp. 6-8 ("Litigation Trust Assets," "Litigation Trust Fund" and "Sale Assets"); section 7.5, p. 16-17.

[38] La. C.C. Art. 2298.

[39] *Pinegrove Elec. Supply Co., Inc. v. Cat Key Const., Inc.*, 88 So.3d 1097, 1100 (La.App. 5 Cir. 2012) (citations omitted).

10

contractual provision."[40]  The transfer of the proceeds of the Chinese Seal was not proper because NOA was contractually bound to use them to pay Seller through its assumption of the Consignment Contract and Louisiana auction law. Further, the funds were not NOA's property. Payment to Seller should have taken place when the proceeds were received in October 2011, long before confirmation, the existence of the Trust or the administrative bar date. Because this was not done, NOA breached its fiduciary duty and contractual obligation to Seller. In addition, NOA affirmatively misrepresented to Seller, the Court, and Pun the status of payment. Because NOA transferred all funds remaining in the consignment escrow account to the Trust, along with all its residual assets, there is no other remedy at law for Seller except to assert an unjust enrichment claim. The Court finds that the Trust was unjustly enriched by its receipt of the proceeds from the sale of the Chinese Seal. Therefore, the Trust is responsible for paying Seller.

### D. Amount of Payment

In the end NOA received a partial payment on the sales price for the Chinese Seal. The Court finds that Seller is entitled to payment of that amount minus the buyer's premium of $14,950.00 and

---

[40] *G. Woodward Jackson Co., Inc. v. Crispens*, 414 So.2d 855, 856 (La.App. 4 Cir. 1982).

the seller's premium of $6,725.00 both of which are owed to NOA.[41]  Therefore, Seller has a claim against the Trust for $8,325.00.[42]

### III. Conclusion

For the reasons assigned above, the Motion for Leave to File Proof of Claim filed by Seller is denied.  The Objection to the Claim of Seller filed by Trustee is sustained in part and denied in part.  For the reasons set forth above, Seller is granted judgment against the Trust for $8,325.00.  The Motion for Return of Property and/or to Enforce Order filed by Seller is moot based on the Court's ruling.

New Orleans, Louisiana, January 15, 2013.

                    Hon. Elizabeth W. Magner
                    U.S. Bankruptcy Judge

---

[41] The consignment agreement provides that from the proceeds of sale, NOA is entitled to costs of sale and commissions on the hammer price calculated: 25% on the first $500.00, 20% of amounts from $501.00-$1,500.00; 15% on amounts from $1,501.00-$2,500.00; and 10% of all amounts over $2,500.00.  Based on a hammer price of $65,000.00, NOA is due $6725.00.  Arguably, NOA's commission might be reduced based on its failure to collect the full hammer price.  However, the Court notes that NOA is also entitled to reimbursement for attorney's fees expended in connection with its collection efforts against Pun.  Since NOA failed to produce any evidence to support this counter-claim, the Court has taken a liberal construction in the calculation of the commission.

[42] As it happens, this amount is far in excess of the expected value of the Chinese Seal when Seller consigned it for auction. The item was expected to garner between $800.00 and $1,200.00 at auction. Trial Exhibit 2. Since unjust enrichment is a remedy in equity, the Court believes this to be a fair result to all concerned.